BL

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark E. Hampton, | No. CV 03-1706-PHX-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| Charles Ryan, et al., | |
| Defendants. | |

Plaintiff Mark E. Hampton is litigating a civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff is represented by counsel.  Currently before this Court is Defendants' Motion for Summary Judgment  (Doc. # 59).  The Court will grant summary judgment and dismiss Plaintiff's action.

**I. Background**

Plaintiff sued former Acting Director of the Arizona Department of Corrections (ADC) Charles Ryan, current Director Dora Schriro, Deputy Warden Conrad Luna, and Correctional Classification Specialist Barbara Shearer, for violations of his civil rights arising out of his placement and continued detention in Special Management Unit Two (SMU II), the "supermax" unit of ADC (Doc. #51).  He brought two counts for relief (Id.).

In Count I, Plaintiff alleged that his constitutional rights were violated by his initial and continued placement in SMU II (Doc. #51).  Plaintiff maintained that (1) his *ex post facto* rights were violated because his validation as a Security Threat Group (STG) member was based on acts occurring before 1995, when the Aryan Brotherhood was designated as an STG; (2) his due process rights were violated by his initial validation; (3) his due process

1    rights were violated by a "meaningless" review of his placement; (4) his substantive and
2    procedural due process rights were violated by being required to "debrief" or "snitch" in
3    order to be transferred; and (5) his substantive due process rights were violated by being
4    placed in indefinite solitary confinement with "atypical" conditions (Id.).  Plaintiff also
5    believes that as long as he remains confined in SMU II, he is not eligible for parole (Id.).

6          In Count II, Plaintiff alleged that his Eighth Amendment rights were violated by the
7    denial of life's minimum necessities and the right to be free from cruel and unusual
8    punishment, including: (1) virtually complete isolation; (2) constant exposure to lighting;
9    (3) limited recreation or exercise opportunities; (4) denial of food; (5) denial of other
10   privileges; (6) denial of sufficient opportunities to shower, cold weather clothing and basic
11   over-the-counter medications; (7) restricted personal liberties; and (8) humiliating treatment
12   (Id.).  Plaintiff also argued that Defendants were deliberately indifferent to his medical needs
13   because they did not provide him adequate treatment for his various medical conditions.
14   Plaintiff seeks injunctive, declaratory, and monetary relief (Id.).

15         Defendants moved for summary judgment, submitting the declarations of Supervisor
16   of the STG Unit Todd Gerris, Classification Manager Stacy Crabtree, Deputy Warden Carson
17   McWilliams, Electrical Engineer Gerald E. Katafiasz, and Dr. Jeffery Sharp, M.D.; the
18   affidavit of Time Computation Program Specialist Susan Kaye; and a transcript of Plaintiff's
19   deposition (Docs. ##59, 60).

20         Plaintiff responded, attaching his affidavit;[1] affidavits of Dr. James. F. Doris, M.D.,
21   Beckie Bonnell, Plaintiff's sister, and fellow inmate William Mark Isbelli; the statement of
22   George M. DeLong, Ph.D.; a deposition of Lieutenant William Powell, Jr., taken in Koch v.
23   Lewis, No. 90-1872; and responses to inmate grievances submitted by Plaintiff (Doc. #66).

24   **II. Mootness**

25         Initially, the recent changes in policy do not moot Plaintiff's case.  First, voluntary
26   cessation does not necessarily moot an issue as Defendants may reinstate prior policies.  See

27   _____

28         [1] Plaintiff's signed affidavit was filed with his Amended Response (Doc. #73).

Chemical Producers and Distrib. Ass'n v. Helliker, 463 F.3d 871, 877-78 (9th Cir. 2006). Second, the new policies merely change the landscape, *i.e.* provide Plaintiff an opportunity for transfer without debriefing and provide additional recreational opportunities, but do not change the constitutional challenges, *i.e.* that Plaintiff's due process rights are violated by his continued placement in SMU II and his Eighth Amendment rights are violated by the lack of sufficient outdoor recreational opportunities.

**III. Motion for Summary Judgment**

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion, and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate that the fact in contention is material and that the dispute is genuine. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986); see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). A fact is material if it might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 250. The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Finally, when considering a summary judgment motion, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

1    **IV. Due Process**

2        **A.  The STG Process and Plaintiff's Validation**

3        ADC implemented a policy "to minimize the threat that inmate gang activity poses

4    to the safe, secure and effective operation of Arizona's prisons" (Doc. #60, ex. A ¶ 3).  The

5    policy provides for the identification, validation, and re-classification of inmates determined

6    to be members of an STG (Id.).  An STG is "[a]ny organization or group of individuals,

7    either formal or informal, . . . that may have a common name or identifying sign or symbol,

8    and whose members engage in activities that include, but are not limited to: planning,

9    organizing, threatening, financing, soliciting, committing or attempting to commit unlawful

10   acts or acts that would violate the Department's written instructions, which detract from the

11   safe and orderly operation of prisons" (Id. ¶ 4).  A validated STG member is considered an

12   ongoing threat to prison security (Id. ¶ 13).  In 1995, ADC determined that the Aryan

13   Brotherhood was an STG (Doc. #51).

14       When an inmate is suspected of being an STG member, an investigation is conducted

15   to determine if the inmate meets the validation criteria (Doc. #60, ex. A ¶ 6).  The staff

16   considers as indicators of STG activity things such as gang-specific tattoos, possession of

17   gang-related literature, self-admissions, and voluntary association with other gang members,

18   which may be demonstrated in group photographs (Id.).  If the inmate meets validation

19   criteria, he is given a hearing (Id.).  The inmate is provided prior notice of the hearing and

20   may present a defense (Id. ¶ 9).

21       Plaintiff was notified that he was a suspected member of an STG five days before his

22   validation hearing (Doc. #60, ex. A ¶ 23; ex. G at 39).  Plaintiff was advised of his right to

23   appear at the hearing and to request witnesses (Id. ex. A ¶ 23; ex. G at 40).  Plaintiff was

24   present at his October 28, 1998, hearing, and the testimony of his three witnesses which he

25   received prior to the hearing was submitted (Id. ex. A ¶¶ 23-24; ex. G at 40-41).

26       On October 28, 1998, Plaintiff was validated as a member of the Aryan Brotherhood

27   based on (1) a photograph taken at ASPC-Florence/Central Unit, Athletic Field with Plaintiff

28   and at least five suspected or validated members of the Aryan Brotherhood; (2) an ADC

report documenting Plaintiff's association with three validated and one suspected member of the Aryan Brotherhood; (3) an ADC report documenting observations of Plaintiff associating with two validated and one suspected member of the Aryan Brotherhood; and (4) two membership lists recovered from separate validated Aryan Brotherhood members that included Plaintiff's name and ADC number (Doc. #60, ex. A ¶ 24; ex. G at 39).  Plaintiff, however, maintains that the evidence was not sufficient to support a conclusion that he was a member of the Aryan Brotherhood (Id. ex. G at 42).  In particular, Plaintiff contended that the alleged association consisted of a conversation with two separate individuals, one conversation occurring in 1991 (Id. at 45-46; Doc. #66, Plaintiff's Aff. ¶ 3).  Plaintiff did not recall any specifics of the conversations, but denied discussing Aryan Brotherhood-related activities (Doc. #66, Plaintiff's Aff. ¶ 3).  Plaintiff testified that the group photograph was taken between October 1989 and July 1991, and was actually a picture of a group of individuals working in an inmate-run snack shop and was taken with ADC approval, by an ADC staff member (Doc. #60, ex. G at 48-49; Doc. #66, Plaintiff's Aff. ¶ 2).  Plaintiff denied knowingly associating with members of the Aryan Brotherhood (Doc. #60, ex G at 47).  In fact, Plaintiff has family members who are of Hispanic heritage and he harbors no ill-will toward anyone on the basis of race (Doc. #66, Plaintiff's Aff. ¶ 10).  Plaintiff denied membership in an STG, and he believes that he was validated due to his refusal to testify in a criminal prosecution (Id. ¶¶ 9-10).

If the inmate is determined to be an STG member, he may renounce gang membership and debrief, accept the validation but choose not to debrief, or appeal the validation (Doc. #60, ex. A ¶ 10).  Plaintiff chose not to debrief, and his appeal from the validation was denied on November 1, 1998 (Id. ex. A ¶¶ 25, 29; ex G at 30).  A validated STG member who does not debrief and whose appeal is denied is housed in SMU II (Id. ex. A ¶ 11).  SMU II is a high-security facility for inmates with high-risk needs, including (1) STG members, (2) death row inmates, (3) inmates under investigation for protective custody, and (4) inmates with high classification scores (Id. ex C ¶ 7).  Plaintiff was transferred to SMU II on February 8, 1999 (Id. ex. A ¶ 26; Doc. #66, Plaintiff's Aff. ¶ 4).

1    ADC reviews the inmate's case approximately every 180 days (Doc. #60, ex. B ¶ 12).

2    Absent security concerns, generally an inmate is present during the review and may make a

3    statement and present information (Id. ¶ 13).  If there is a security concern, the inmate is not

4    present at the hearing and cannot make a statement or present evidence (Id. ¶ 14).  If no

5    change is expected as to his placement, an inmate may also waive his right to appear, and

6    submit a written statement (Id.).  In addition, an inmate is not present for a Type 89 review,

7    i.e. a quick paperless review that does not affect an inmate's classification (Id. ¶ 13).

8    Plaintiff has received a classification review approximately every 180 days since his

9    placement in SMU II (Doc. #60, ex. B ¶ 15).  Prior to each review, Plaintiff was served with

10   classification referral notices which informed him of the hearing, and notified him of his right

11   to appear at the hearing, call relevant witnesses, remain silent, receive a finalized copy of the

12   findings, and appeal any errors or overrides (Id. ¶ 16).  Plaintiff also had approximately three

13   Type 89 reviews (Id. ¶ 17).  Plaintiff testified that for the first few years after his validation,

14   he received two in-person hearings a year (Id. ex. G at 63).  Currently, he is provided one

15   paperless and one in-person review each year (Id.).  Plaintiff, however, is informed after the

16   paperless review that there will be no change in his classification (Id. at 66).  Plaintiff

17   admitted that he refused to attend his first few hearings because he believed it "was an

18   exercise in futility" because he was unwilling or unable to renounce or debrief (Id. at 64).

19   The STG inmate may be released from SMU II confinement if he subsequently

20   renounces STG membership and satisfactorily competes the debriefing process (Doc. #60,

21   ex. A ¶ 14;ex. C ¶ 8).  The purpose of debriefing is not to obtain incriminating criminal

22   information or evidence against an inmate, but so (1) the inmate can convince ADC that he

23   is no longer a member of the STG; (2) the inmate can provide information regarding the STG

24   in order to assist ADC in management; and (3) ADC can determine if the inmate requires

25   protection (Id. ex. A ¶ 15).

26   ADC recently modified its policy to allow an STG inmate to be re-classified without

27   debriefing (Doc. #60, ex. A ¶ 16; ex. C ¶ 9).  In particular, the STG Step-Down Program

28   provides an alternative method for validated STG inmates to demonstrate to that they are no

1   longer involved in STG activity (Id. ex. A ¶ 16).  To qualify for the Step-Down Program, an

2   inmate must spend 48 months as a validated STG member (Id. ¶ 17).  An inmate may request

3   to participate in the program if he has not participated in any documented gang activity or

4   gang-like activity and has no documented incidents of assaults, extortion or threats against

5   staff or other inmates for the 24 months prior to the request (Id.).  An inmate may also qualify

6   for the program upon recommendation by Institutional Re-Classification staff, Unit Deputy

7   Warden, STG Unit staff, or Central Classification staff (Id. ¶ 18).   The inmate must

8   successfully complete a polygraph examination regarding his intent in participating in the

9   program (Id. ¶ 17).

10       The Step-Down Program takes 18 months to complete, during which time the inmate

11   must (1) not participate in any significant STG activity; (2) complete certain programs such

12   as anger management; (3) attend counseling as necessary; (4) participate in peer support

13   group activities; (5) refrain from disciplinary behavior that changes his classification or

14   housing assignment; and (6) not have unrestrained movement until Department Psychology

15   staff and the Staff Inmate Reintegration Team have completed an evaluation (Doc. #60, ex.

16   A ¶¶ 19).

17       The Step-Down Program is divided into 6 phases, and each phase is 90 days in

18   duration (Doc. #60, ex. A ¶ 20).  Upon successful completion of the 18-month program, the

19   inmate may be eligible for transfer out of SMU II to Central Unit's general population or

20   remain in the Step-Down Program (Id. ¶¶ 20).  Plaintiff was accepted as part of the second

21   group of inmates in the Step-Down Program (Doc. #66, Plaintiff's Aff. ¶ 7).

22       **B. Procedural Due Process - Initial Placement**

23       Defendants admit that Plaintiff has a liberty interest in not being placed in SMU II,

24   but argue that he received sufficient due process (Doc. #59).[2]  Plaintiff argued that the

25   evidence used to validate him was almost exclusively pre-1995 evidence, which was when

26

27       [2] Defendants also argue that Plaintiff's challenge to his initial placement is
time-barred.  However, because this was raised for the first time in the reply, and Plaintiff
28   is unable to contest this assertion, this issue will not be considered.

1   ADC announced that the Aryan Brotherhood was considered a security threat group (Doc.

2   #66).  Thus, his validation violated his *ex post facto* rights (Id.).  Moreover, the evidence did

3   not involve conduct evidence, it provided for Plaintiff's validation based on his mere

4   membership in a group (Id.).

5       The Due Process Clause of the Fourteenth Amendment prohibits the states from

6   "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const.

7   amend. XIV, § 1.  To determine whether a procedural due process violation has occurred, a

8   court engages in a two-step analysis.  First, a court looks to whether the person possess a

9   constitutionally cognizable liberty interest with which the state has interfered.  Sandin v.

10  Conner, 515 U.S. 472 (1995).  Second, if the state has interfered with a liberty interest, a

11  court looks to whether this interference was accompanied by sufficient procedural and

12  evidentiary standards.  Kentucky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989);

13  Zimmerlee v. Keeney, 831 F.2d 183, 186 (9th Cir. 1987).

14      The parties concede that Plaintiff has a protected liberty interest in avoiding detention

15  in SMU II.  See Wilkinson v. Austin, 545 U.S. 209, 224 (2005) (providing that a supermax

16  facility may impose "atypical and significant hardship on the inmate in relation to the

17  ordinary incidents of prison life").  Plaintiff is entitled to sufficient procedural and

18  evidentiary standards.  The initial decision to place an inmate in maximum custody generally

19  satisfies due process if the inmate is given notice of the factual basis for the placement and

20  an opportunity to be heard.  Id. at 225-27; Hewitt v. Helms, 459 U.S. 460, 476 (1983).

21  Plaintiff admitted that he received notice five days prior to the validation hearing, was

22  present at the hearing, and was given the opportunity to present the testimony of three

23  witnesses (Doc. #60, ex. G at 39-41).  Plaintiff was thus provided the process due him.

24      Plaintiff argued that the evidence was insufficient to determine that he was a member

25  of an STG.  In particular, Plaintiff maintained that the evidence was (1) unreliable, (2) based

26  on his alleged status and (3) stale, in violation of his *ex post facto* rights (Doc. #66).  First,

27  Plaintiff maintained that the evidence used to validate him was unreliable and insufficient.

28  Because the validation process is administrative rather than disciplinary, the Due Process

1    Clause only requires that the ADC have "some evidence" of membership. <u>Bruce v. Ylst</u>, 351

2    F.3d 1283, 1287 (9th Cir. 2003); <u>see also</u> <u>Hill v. Superintendent</u>, 472 U.S. 445, 453 (1985).

3    The Court will "not examine the entire record, independently assess witness credibility, or

4    reweigh the evidence; rather, 'the relevant question is whether there is any evidence in the

5    record that could support the conclusion.'" <u>Id.</u>  In support of his argument regarding the

6    unreliability of the evidence, Plaintiff presented a deposition from another case of a

7    lieutenant whose responsibility was to assist in the assimilation of criteria evidence in the

8    preparation of validation packets on the STG suspects (Doc. #66, ex. 4 at 5).  Lieutenant

9    Powell testified that the reason a picture was taken is irrelevant; if two or more suspected

10   gang members are in a picture it can be used as evidence to validate an inmate (<u>Id.</u> at 24).

11   Further, as for whether an inmate associated with a gang member, there is no indication if

12   such contact was regular (<u>Id.</u> at 32).  Finally, Powell cast doubt on the reliability of the Aryan

13   Brotherhood membership list (<u>Id.</u>).

14          Notably, this deposition was taken in another case in regard to another inmate and

15   there is no indication that Powell was involved in assimilating information with regard to

16   Plaintiff, or that the unreliable list was the same as the one used against Plaintiff.  In addition,

17   there was "some evidence" to demonstrate Plaintiff's membership in the Aryan Brotherhood.

18   Plaintiff was validated based on a photograph, his reported association with members of the

19   Aryan Brotherhood, and his name being found on two membership lists  (Doc. #60, ex. A

20   ¶ 24).  The Court will not independently reweigh this evidence, or assess its credibility.

21   Because it is enough that there was "some evidence," Plaintiff's argument lacks merit.

22          Second, Plaintiff maintains that the evidence was based on his status, not conduct

23   (Doc. #66).  Plaintiff does not contest the conclusion that the Aryan Brotherhood is a gang

24   and thus an STG (<u>Id.</u>).  He merely maintains that he should not be validated based on his

25   mere status as a suspected member, but may only be placed in SMU II if he did something

26   related to his membership (<u>Id.</u>).  Plaintiff's argument lacks merit.  ADC's STG policy is not

27   disciplinary, but an attempt to provide for "the safe, secure and effective operation of

28   Arizona's prisons" (Doc. #60, ex. A ¶ 3).  As previously noted, ADC presented "some

1   evidence" as to Plaintiff's membership in an STG.  His membership is sufficient to result in

2   his validation and placement into SMU II, without the need to present "conduct evidence."

3   See Bruce, 351 F.3d at 1287-88 (finding that evidence of Plaintiff's association with and

4   membership in a gang was sufficient to validate him as a member).

5       Finally, Plaintiff asserts that the evidence violated his *Ex Post Facto* rights (Doc. #66).

6   Plaintiff's argument is without merit.  "Article I, § 10, of the Constitution prohibits the States

7   from passing any 'ex post facto Law.'" California Dep't. of Corrs. v. Morales, 514 U.S. 499,

8   504 (1995).  However, this "Clause is aimed at laws that 'retroactively alter the definition

9   of crimes or increase the punishment for criminal acts.'" Id.  The STG policy is not criminal

10  and is not intended to punish.  Instead, it is administrative and its purpose is to provide for

11  "the safe, secure and effective operation of Arizona's prisons" (Doc. #60, ex. A ¶ 3).  In

12  addition, Plaintiff was not validated based solely on his pre-1995 membership.  The pre-1995

13  evidence was used to demonstrate Plaintiff's continual membership in the Aryan

14  Brotherhood.

15      In sum, Defendants are entitled to summary judgment as to Plaintiff's claim that his

16  initial validation and placement into SMU II violated his Due Process rights.

17  **C. Due Process - Periodic Reviews**

18      Defendants argue that Plaintiff's continued placement is supported by proper

19  procedural and evidentiary safeguards (Doc. #59).  Defendants maintain that annual reviews

20  are proper, and Plaintiff is provided an in-person or paper review every 180 days (Id.).  For

21  the in-person reviews, Plaintiff receives notice, and has the opportunity to attend, call

22  witnesses, and remain silent (Id.).  Plaintiff is then provided a report of the hearing, and may

23  appeal the determination (Id.).

24      Plaintiff has not disputed that he was provided with these protections.  Instead,

25  Plaintiff argued that based on the length of his detention, more than eight years, he has been

26  deprived of any meaningful review (Doc. #66).  First, he asserted that he cannot debrief

27  because it would place his safety in danger, he was never a member of the Aryan

28  Brotherhood, and any information would be out-dated (Id.).  Second, Plaintiff  maintained

1   that the Step-Down Program should not be considered because no inmate has finished it, and

2   there is no guarantee that upon completion he would be transferred out of SMU II (Id.).

3          Plaintiff is entitled to "some sort" of periodic review of his status. See Hewitt, 459

4   U.S. at 477 n.9 ("[A]dministrative segregation may not be used as a pretext for indefinite

5   confinement of an inmate.  Prison officials must engage in some sort of periodic review of

6   the confinement of such inmates").  To determine whether the periodic review afforded

7   Plaintiff conforms to due process requirements, this Court must consider "[1] the private

8   interest that will be affected by the official action; [2] the risk of an erroneous deprivation

9   of such interest through the procedures used, and the probable value, if any, of additional or

10  substitute procedural safeguards; and [3] the Government's interest, including the function

11  involved and the fiscal and administrative burdens that the additional or substitute procedural

12  requirement would entail." Wilkinson, 454 U.S. at 225; see also Matthews v. Eldridge, 424

13  U.S. 319 (1976).

14         First, a prisoner's private interest in remaining free of supermax incarceration is not

15  comparable to "the right to be free from confinement at all." Wilkinson, 545 U.S. at 225.

16  Rather, the interest must be evaluated "within the context of the prison system and its

17  attendant curtailment of liberties." Id.  While the difference between Plaintiff's conditions

18  of confinement and those of other prisoners may be substantial or even "atypical and

19  significant," they are less marked and hence require less "process than an initial criminal

20  conviction." Id.

21         Second, Plaintiff does not face a high risk of an erroneous result.  ADC relies on

22  Plaintiff renouncing gang membership and debriefing, thus, there is no subjective weighing

23  of evidence by prison officials to find misconduct or risks.  Rather, the determination is based

24  upon the objectively verifiable determination that the prisoner again failed to "debrief."

25  Moreover, debriefing is a highly effective method for determining a prisoner's ongoing

26  loyalty to the prison gang.  Plaintiff's argument that he was improperly validated or was

27  never a member of the Aryan Brotherhood is not material to his semi-annual reviews as it is

28  merely an attempt to challenge his initial validation, which was already accorded proper

1   procedural protections.

2       Additionally, Plaintiff does not have the right to require periodic appeals of his

3   validation, but only periodic reviews of his current status.  See Hewitt, 459 U.S. at 477, n.9

4   (noting that the requisite period reviews "will not *necessarily* require that prison officials

5   permit submission of any additional evidence or statements" as to the initial decision).

6   Plaintiff has not demonstrated that the procedures provided have a significant risk of error,

7   particularly since Plaintiff's placement is reviewed on a semi-annual basis.  Additionally and

8   most importantly, Plaintiff is now in the Step-Down Program and his concerns about having

9   to debrief have been alleviated, and results in an additional safeguard.  Notably, the existence

10  of the Step-Down Program may properly be considered even if its effectiveness has not been

11  proven.

12      Third, the government interest results in Defendants having an obligation to "ensure

13  the safety of guards and prison personnel, the public, and the prisoners themselves," while

14  battling intractable prison gangs and allocating limited resources.  Wilkinson, 545 U.S. at

15  225.  "[T]his interest is a dominant consideration."  Id.  Balancing the factors – the private

16  interest, the risk of an erroneous deprivation, and the Government's interest – the Court finds

17  that Plaintiff has failed to show that the process afforded to him is inadequate.  Accordingly,

18  Defendants are entitled to judgment as a matter of law as to Plaintiff's procedural due process

19  claim.

20      **D. Parole Determination**

21      Plaintiff believed that his STG status would prevent him from being placed on parole

22  (Doc. #51).  Defendants argue that there is no prison regulation prohibiting Plaintiff from

23  being parole eligible (Doc. #59).  On July 16, 1986, Plaintiff was sentenced to life

24  imprisonment without possibility of parole for the first 25 years, for First Degree Murder,

25  Attempted Armed Robbery, and Aggravated Assault (Doc. #60, ex. E ¶ 3).  An inmate who

26  is in STG is not eligible for the restoration of lost earned release credit days on Class III

27  parole non-eligibility status (Doc. #60, ex. E ¶¶ 6-7).  However, Plaintiff's validation does

28  not result in forfeiture of any earned release credit or his placement into Class III parole

1  non-eligible status (Id. ¶ 8).  Crabtree attested that Plaintiff's parole eligibility is not affected
2  by his validation as a member of an STG, and Plaintiff is eligible for parole in April 2011 (Id.
3  ¶¶ 9, 11).

4       Plaintiff stated in his Statement of Facts that in light of criteria used by the parole
5  board, his membership in an STG is fatal to any parole determination (Doc. #66, ¶ 14).
6  Plaintiff, however, has presented no evidence supporting this belief.  Defendants, in contrast,
7  have demonstrated that Plaintiff's placement into SMU II does not affect his parole
8  eligibility.  Although it is likely that the parole board will consider such placement in making
9  any parole determinations, the Court will not assume that such placement will automatically
10  result in the denial of parole.  Thus, Defendants are entitled to summary judgment as to
11  Plaintiff's claim that his placement will result in denial of parole.

12  **E. Substantive Due Process**

13       In addition to asserting procedural due process rights, Plaintiff's Amended Complaint
14  alleges that  he has been denied his substantive due process rights by his confinement in
15  SMU II.  "To establish a violation of substantive due process in this context, a plaintiff is
16  ordinarily required to prove that a challenged government action was 'clearly arbitrary and
17  unreasonable, having no substantial relation to the public health, safety, morals, or general
18  welfare'.   However, '[w]here a particular amendment 'provides an explicit textual source
19  of constitutional protection' against a particular sort of government behavior, 'that
20  Amendment, not the more generalized notion of "substantive due process," must be the guide
21  for analyzing [a plaintiff's] claims.' " Patel v. Penman, 103 F.3d 868, 874 (9th Cir. 1996)
22  (internal citations omitted).

23       To the extent that he intended to challenge the procedures resulting in his placement
24  in SMU II, those claims were addressed in connection with Plaintiff's procedural due process
25  rights.  Accordingly, any freestanding substantive due process claim is unsupportable and
26  Defendants will be granted summary judgment on this claim.

27
28

1   **V. Eighth Amendment**

2       **A. Conditions of Confinement**

3       Plaintiff contends that the conditions of SMU II violate the Eighth Amendment (Doc.

4   #51).  "[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual

5   punishment forbidden by the Eighth Amendment." <u>Whitley v. Albers</u>, 475 U.S. 312, 319

6   (1986).  "Among 'unnecessary and wanton' inflictions of pain are those that are totally

7   without penological justification." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 346 (1981).

8       "'An Eighth Amendment claim that a prison official has deprived inmates of humane

9   conditions must meet two requirements, one objective and one subjective.' 'Under the

10  objective requirement, the prison official's acts or omissions must deprive an inmate of the

11  minimal civilized measure of life's necessities.'" <u>Lopez v. Smith</u>, 203 F.3d 1122, 1132-33

12  (9th Cir. 2000) (internal citations and citations omitted).  The subjective prong requires the

13  inmate to demonstrate that the deprivation was a product of "deliberate indifference" by

14  prison personnel. <u>Wilson v. Seiter</u>, 501 U.S. 294, 302-03 (1991).  Such indifference can only

15  occur if "the official knows of and disregards an excessive risk to inmate health or safety; the

16  official must both be aware of facts from which the inference could be drawn that a

17  substantial risk of serious harm exits, and he must also draw the inference." <u>Farmer v.</u>

18  <u>Brennan</u>, 511 U.S. 825, 837 (1994).

19      Defendants maintain that Plaintiff is not being denied the basic necessities of life, and

20  that they did not know of and disregard an excessive risk to harm (Doc. #59).  Defendants

21  further argue that Plaintiff has suffered no physical injury (<u>Id.</u>).  Plaintiff argues that he has

22  been denied the basic necessities of life and exposed to psychological torture (Doc. #66).

23      **1. Solitary Confinement**

24      In SMU II, there are 10 inmates per pod, and each inmate resides alone in a cell (Doc.

25  #60, ex. C ¶ 5).  Two officers are assigned per pod, one in the control room in charge of the

26  doors, and one attending the daily activities of the inmates, including transporting inmates,

27  laundry, delivering meals, delivering and collecting mail, conducting welfare and security

28  checks, and facilitating medical appointments (<u>Id.</u> ¶ 10).

1      Initially, Plaintiff alleged that he was denied basic privileges, including rehabilitation

2  opportunities, classes, vocational programs, and other activities (Doc. #51). Plaintiff also

3  alleged that he is permitted few books, magazines, and newspapers, and cannot purchase

4  other recreational items such as playing cards (Id.). However, "[i]dleness and the lack of

5  programs are not Eighth Amendment violations. The lack of these programs simply does not

6  amount to the infliction of pain. There is no constitutional right to rehabilitation." Hoptowit

7  v. Ray, 682 F.2d 1237, 1254-55 (9th Cir. 1982) (internal citations omitted). Moreover, ADC

8  can require an inmate to receive books, magazines, and newspapers only from a publisher

9  or bookstore. See Bell v. Wolfish, 441 U.S. 520, 549-50 (1979) (providing that a prison's

10  rule that permits the receipt of hard cover books only from publishers or bookstores did not

11  violate inmates' constitutional rights). Plaintiff is allowed to obtain books, magazines, and

12  newspapers from publishers and bookstores. Plaintiff does not have a constitutional right to

13  participate in classes or programs or to purchase recreational items, and does not have an

14  unfettered right to reading materials. Thus, these claims alone do not result in the deprivation

15  of Plaintiff's minimal civilized measure of life's necessities. See Lopez, 203 F.3d at

16  1132-33. However, these factors will be considered in Plaintiff's claim of social isolation.

17      Plaintiff argued that he is subjected to virtually complete isolation because he is

18  unable to socialize with other prisoners, has limited telephone privileges and visitation with

19  members of the general public, and is denied contact visitation. "The Eighth Amendment

20  standards for conditions in isolation, segregation, and protective custody cells are no different

21  from standards applying to the general population." Hoptowit, 682 F.2d at 1258. "The

22  longer the prisoner is without . . . benefits, the closer it becomes to being an unwarranted

23  infliction of pain." Id. "[A]dministrative segregation, even in a single cell for twenty-three

24  hours a day, is within the terms of confinement ordinarily contemplated by a sentence."

25  Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995). However, placing an

26  inmate in isolation can "adversely affect a person's mental health." Comer v. Stewart, 215

27  F.3d 910, 916 (9th Cir. 2000).

28      Inmates may talk to staff several times a day, and counselors are available five days

a week for face to face conversations (Doc. #60, ex C ¶ 11).  Inmates have access to a library, and may check out legal material (Id. ¶ 13).  Inmates may receive reading, educational, and other materials through the mail, including magazines, books, and tapes (Id.).  Plaintiff, however, does not read newspapers because he does not have a subscription  (Id. ex. G at 92).

Inmates are allowed one non-contact visit a week for one to two hours (Doc. #60, ex. C ¶ 20).  Inmates may have four visitors at a time, and the inmate and visitors are separated by glass (Id.).  Plaintiff uses approximately three to four visitation periods per year (Id. ex. G at 81).  Additionally, inmates may make one five minute phone call approximately each week (Id. ex. C ¶ 21).  Plaintiff uses his phone privileges on a weekly basis (Id. ex. G at 81).  Plaintiff also sends and receives letters and correspondences (Id. ex. C ¶ 14).

Plaintiff is not eligible for work, or group recreational, vocational, or education programs (Doc. #60, ex. ¶ 24).  Plaintiff may participate in certain programs in his cell, such as the Kentucky GED program and educational correspondence courses, and has access to special education if he qualifies (Id.).  In fact, Plaintiff has taken courses in anger management, alcohol education, and drug rehabilitation (Id. ex. G at 93-94).  Plaintiff also possesses a walkman radio-cassette and a 13-inch television (Id. ex. C ¶ 15).  Finally, although inmates are not permitted to pass notes or share legal documents with other inmates, they can communicate with inmates in their pod from cell to cell (Id. ¶¶ 16-17).  However, such communication is in violation of ADC rules (Id, ex. G at 94).

Based on the summary judgment evidence, Plaintiff is provided the minimal civilized measure of life's necessities in the form of services and privileges.  Lopez, 203 F.3d at 1132-33.  However, eight years of isolation such as that faced by an SMU II inmate may be detrimental.  In support of that conclusion, Plaintiff introduced Dr. DeLong's statement in which he opined that Plaintiff's confinement is "toxic" (Doc. #66, DeLong's statement at 3).[3]

---

[3] It should be noted that several of the conditions which DeLong believes are "toxic" include conditions also found in general population, such as the inability to receive books from individuals and the requirement that phone calls are collect.

1    DeLong further opined that "it is a mistake to house [Plaintiff] for an indeterminate number

2    of years in an SMU facility" (Id.).

3        The evidence shows that Plaintiff is not totally isolated and his confinement is not

4    indeterminate.   Plaintiff is allowed visitors and he may use the telephone.   Plaintiff's

5    visitation is limited, however, such limitation is constitutionally permissible.  See Kentucky

6    Dept. of Corrections, 490 U.S. at 460 (providing that inmates do not have a right to

7    "unfettered visitation"); see also Toussaint v. McCarthy, 801 F.2d 1080, 1113 (9th Cir. 1986)

8    (providing that inmates are not constitutionally entitled to contact visitation).  Plaintiff may

9    talk to staff and counselors, he is allowed out of his cell several hours a week, he may write

10   and receive letters, and he has access to the library and various forms of media.  Plaintiff has

11   failed to pursue any mental health services.  Plaintiff attributes this to not being provided

12   mental health services on the single occasion in which he requested help (Doc. #66,

13   DeLong's statement at 3; Plaintiff's Statement of Facts ¶ 97).  Plaintiff also is described as

14   paranoid and unable to trust (Doc. #66, DeLong's statement at 3).  Plaintiff, however,

15   testified that he does not need mental health treatment (Doc. #60, ex. G at 92).  The fact that

16   Plaintiff's single request went unanswered, combined with his failure to again seek these

17   services, and his paranoia, does not eliminate the Court's consideration of these services

18   because they are available to Plaintiff.

19       Finally, because Plaintiff has been placed into the Step-Down Program and is working

20   toward re-classification without the necessity of debriefing, these conditions are not

21   necessarily indefinite.  Thus, while such isolation may not be the best means of rehabilitating

22   an inmate, it does not result in the denial of Plaintiff's Eighth Amendment rights.

23   Accordingly, Defendants are entitled to summary judgment as to this claim.

24       **2. 24-Hour Cell Lighting**

25       Plaintiff asserts that he is constantly exposed to lighting, which cannot be turned off

26   by inmates and are not turned off by staff.   "'Adequate lighting is one of the fundamental

27   attributes of "adequate shelter" required by the Eighth Amendment.'"  Keenan v. Hall, 83

28   F.3d 1083, 1091 (9th Cir. 1996) (citations omitted).  "Moreover, '[t]here is no legitimate

1 penological justification for requiring [inmates] to suffer physical and psychological harm

2 by living in constant illumination." Id.

3     Each building in SMU II contains twelve clusters, which in turn contains six pods

4 (Doc. #60, ex. C ¶ 25). Each pod contains ten cells, five of which are on the lower level and

5 five of which are on the upper level (Id.). There are skylights in each pod, but because

6 Plaintiff is housed on the bottom he rarely sees natural light (Id. ex. G at 84). The front of

7 each cell is made of a solid sheet of metal with perforations measuring less than one inch in

8 diameter with a solid trap in the cell door used for various purposes, including passing items

9 into the cell and securing inmates before they are removed from the cell (Id. ex. C ¶ 27).

10 Each cell contains a bed against the far wall, and a sink with a bolted mirror, toilet, and

11 writing surface against the left wall (Id. ¶ 28; ex. G at 84). Above the mirror is a lighting

12 fixture approximately two feet by ten inches, which contain four lights (Id. ex. C ¶¶ 29-30).

13 One of the four lights is a security light that remains illuminated for 24 hours per day (Id.

14 ¶ 30; ex. G at 73).

15     The security light consists of a seven-watt flourescent bulb and is approximately as

16 bright as a child's nightlight (Doc. #60, ex. C ¶ 30-31). The non-security lights are turned

17 off from 10:00 p.m. until 4:00 a.m. on weekdays, and from 12:00 p.m. until 4:00 a.m. on

18 weekends (Id. ¶ 32; ex. G at 73). Inmates must be awake by 7:00 a.m. (Id. ex. C ¶ 41).

19 During this time there is also minimal light entering each cell from outside, consisting of a

20 light at the end of each hallway and a light from the security tower which can be seen

21 through the skylight located in the ceiling of each cluster (Id. ¶¶ 26, 33).

22     An inmate may sleep with his eyes covered, but is not permitted to cover his entire

23 face (Doc. #60, ex. C ¶ 35). Plaintiff sleeps with a towel over his head (Id. ex. G at 76).

24 However, this does not block out all the ambient light (Id.).

25     Gerald E. Katafiasz, an electrical engineer, stated that he conducted tests in an SMU II

26 cell to determine the level of lighting, measured by a footcandle (the amount of light that a

27 candle emits in an approximately 1 square foot area around a candle) (Doc. #60, ex. D ¶¶ 6,

28 7). Katafiasz measured the light levels multiple times on two occasions, from 2:15 p.m. until

1   3:15 p.m. and from 9:45 p.m. until 10:15 p.m. (Id. ¶ 7).  Katafiasz found that during the day,

2   the light in the cell was approximately 88 footcandles (Id. ¶ 9).  However, during the night,

3   the cell light was illuminated such that the light was brighter in the sink area, and darker near

4   the end of the bed (Id. ¶¶ 12-14).  In particular, near the end of the bed the average light was

5   .21 footcandle, and near the sink the average light was approximately .29 footcandle (Id.

6   ¶¶ 13-14).

7         McWilliams attested that the security light serves the penological purpose of enabling

8   officers to perform health and welfare checks on every hour (Doc. #60, ex. C ¶ 34).  The

9   security light is essential for security purposes and for the safety of the corrections officers

10  (Id. ¶ 37).  The perforated cell fronts hinder the visibility of an approaching officer, and the

11  light provides a sense of depth perception (Id.).  Further, flashlights are highly disruptive to

12  sleep and result in blind spots (Id. ¶¶ 39-40).  Blind spots are problematic due to the violent

13  history of the SMU II inmates, who would be able to shoot metal darts through the perforated

14  holes in the cell front (Id. ¶ 40).  Finally, providing the inmate complete darkness would

15  severely hamper ADC's ability to maintain a safe environment because unobserved inmates

16  would be able to create weapons and other contraband (Id. ¶ 42).

17        The prison has a legitimate penological interest in 24-hour cell lighting.  The lighting

18  allows correction officers to conduct regular security checks on the inmates while

19  maintaining officer safety.  Additionally, the lighting ensures that an inmate is never in

20  complete darkness and thus may be observed at any time, resulting in him being less likely

21  to manufacture contraband materials.  According to the evidence, unlike the lights in Keenan,

22  83 F.3d at 1090-91, the lights in the instant case are significantly dimmed at night and

23  Plaintiff covers his eyes in order to sleep.  The 24-hour lighting is not punitive in nature, and

24  the evidence demonstrates that the 24-hour cell lighting, which is dimmed at night, does not

25  deprive Plaintiff of the minimal civilized measure of life's necessities.  See Lopez, 203 F.3d

26  at 1132-33.  Defendants are entitled to summary judgment as to this claim.

27        **3. Lack of Outdoor Exercise and Direct Sunlight**

28        Plaintiff alleges that he is not permitted outside for any circumstances, and has limited

1  time in a small exercise room without equipment (Doc. #51).  Additionally, his sole contact

2  with the sun is an occasional glimpse through a skylight.

3      Exercise is "one of the basic human necessities protected by the Eighth Amendment

4  [and] the long-term denial of *outside* exercise is unconstitutional." LeMaire v. Maass, 12

5  F.3d 1444, 1457-58 (9th Cir. 1993); see also Toussaint v. Yockey, 722 F.2d 1490, 1492 (9th

6  Cir. 1984).  Moreover, "[d]eprivation of outdoor exercise violates the Eighth Amendment

7  rights of inmates confined to continuous and long-term segregation." Keenan, 83 F.3d at

8  1090 (citations omitted).

9      Originally, STG inmates were allowed to go into a recreational yard three times a

10  week, for one hour intervals (Doc. #60, ex. C ¶ 44).  Beginning in January 2006, STG

11  inmates are allowed to access the recreational yard three days a week for two hour intervals

12  (Id.).  The recreational yard consists of a 23 foot by 11 foot area with 18 foot walls (Id.¶ 45).

13  The floors and walls are cement and the ceiling is made of steel fencing from which fresh air

14  and sunlight may enter (Id.).  Inmates are allowed in the recreational yard in shifts (Id.

15  ¶ 46-49).

16      Plaintiff does not use all of his exercise opportunities because of his medical condition

17  (Doc. #60, ex. G at 76).  However, Plaintiff will use the recreational yard when he is not in

18  pain (Id. at 77).  There is no exercise equipment in the yard, but inmates do have access to

19  a handball (Id. ex. C ¶ 45).  When using the yard, Plaintiff will walk, do push-ups and sit-ups

20  (Id. ex. G at 77-78).  However, Plaintiff rarely uses the handball because the noise disturbs

21  the other inmates (Doc. #66, Plaintiff's Aff. ¶ 6).  Plaintiff also exercises in his cell when he

22  feels up to it, doing various exercises and yoga (Doc. #60, ex. C ¶ 44; ex. G at 78, 98-99).

23      In Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979), the Ninth Circuit approved a

24  California State Prison policy allowing inmates five, one-hour session of exercise per week.

25  Id. at 199-200.  Plaintiff is receiving three, two-hour sessions, which provides him more time

26  than that approved of by the Ninth Circuit.  In the instant case, the "recreational cell" is

27  enclosed and surrounded by cement walls with a mesh ceiling, and does not provide direct

28  sunlight on every occasion in which an inmate is allowed to use it.  However, the inmate does

1  get natural light and fresh air, and is allowed to see the sky.  Accordingly, the current

2  provision of six hours per week of outdoor recreational activity does not result in a

3  deprivation of the minimal civilized measure of life's necessities.  See Lopez, 203 F.3d at

4  1132-33.  Defendants are entitled to summary judgment as to this claim.

5  **4. Lack of Proper Diet**

6  Plaintiff alleged that he is placed on a special, low caloric diet, and not permitted to

7  supplement his diet with purchases from the inmate store (Doc. #51).  Plaintiff maintains that

8  he is not being provided sufficient calories, and as a result his weight has dropped to 120

9  pounds (Doc. #66, ¶¶ 61, 105).

10  "The Eighth Amendment requires only that prisoners receive food that is adequate to

11  maintain health; it need not be tasty or aesthetically pleasing."  LeMaire, 12 F.3d at 1456.

12  "'The fact that the food occasionally contains foreign objects or sometimes is served cold,

13  while unpleasant, does not amount to a constitutional deprivation.'"  Id. (citations omitted).

14  However, if an inmate is served meals with insufficient calories for long periods of time it

15  may be able to demonstrate a violation of his right against cruel and unusual punishment.

16  Id.

17  An STG inmate receives a 2800 calorie diet because of his less active lifestyle (Doc.

18  #60, ex. C ¶ 22).  The diet consists of 100 to 200 less calories than that received by inmates

19  in general population (Id.).  Plaintiff eats three meals a day Monday through Friday, and two

20  on Saturday and Sunday (Id. ex. G at 78).  Plaintiff testified that at one time he lost 35

21  pounds, dropping to 120 pounds (Id. at 90).  Plaintiff stated that his physician believed that

22  his weight loss was self-induced (Id.).  Dr. Sharp opined that the weight loss also could be

23  due to the treatment Plaintiff received for Hepatitis C or related to his Irritable Bowel

24  Syndrome (Id. ex. F ¶¶ 12-14).  As of May 2007, Plaintiff, who is 5 foot 8 inches, weighed

25  187 pounds (Id. ¶ 66).

26  Plaintiff also testified that for approximately one month, between December 10 and

27  January 1, he can purchase some food from the commissary (Doc. #60, ex. G at 97).

28  However, in actuality, he can only do this for approximately two weeks because after that

1   the prison store runs out of supplies (Id. at 98).

2       The summary judgment evidence indicates that Plaintiff is receiving 2800 calories a

3   day.  Plaintiff asserts that his weight dropped down to 120 pounds.  Based on Plaintiff's

4   statements, there is a question of fact as to whether Plaintiff was always provided sufficient

5   calories.  However, Defendants are entitled to summary judgment because there is no

6   evidence that any dietary deprivation was not a product of deliberate indifference.  See

7   Wilson, 501 U.S. at 302-03.  Plaintiff is scheduled to receive 2800 calories a day, which is

8   sufficient for a sedentary inmate.  There is no evidence that any of the Defendants knew that

9   Plaintiff may possibly have been receiving less than the scheduled calories Based on the

10  evidence, Defendants were not deliberately indifferent to Plaintiff's needs and are entitled

11  to summary judgment on Plaintiff's dietary claim.

12          **5. Hygiene and Other Preventative Care**

13      Plaintiff alleged that he can only shower three times per week, and is denied cold

14  weather clothing and over-the-counter medications (Doc. #51).  An STG inmate may shower

15  three times a week, which corresponds with the three outdoor exercise days (Doc. #60, ex.

16  C ¶ 19).  Specifically, Plaintiff is allotted eight minutes of water time to shower and shave

17  (Id. ex. G at 85; Doc. #66, Plaintiff's Aff. ¶ 5).  The inmate also has a sink in his cell, which

18  he may use on days he is not allowed to shower, and he has a toilet and bed (Id.).  Plaintiff's

19  clothes and bedding are laundered on a weekly basis (Doc. #60, ex. C ¶ 18; ex. G at 85).

20      Generally, Plaintiff may purchase only clothing and hygiene items from the prison

21  commissary (Doc. #60, ex. C ¶¶ 18, 23).  Plaintiff testified, however, that in October 1999,

22  ADC collected all the sweats in his possession, and issued new sweats (Doc. #66, Plaintiff's

23  Aff. ¶ 8).  However, these sweats were collected in April 2000, and he was unable to

24  purchase additional sweats until late 2004 (Id.).

25      Plaintiff has not demonstrated that he is unable to maintain his hygiene from the

26  shower opportunities, or that he is being denied sufficient clothing for the cold weather,

27  merely that he did not have sweats for a period of time.  Further, Plaintiff has presented no

28  evidence that the lack of over-the-counter medications is detrimental, particularly since he

is being seen in the infirmary on a regular occasions.  Thus, Defendants are entitled to summary judgment as to this issue.

**6. Security**

Plaintiff alleged that he is subjected to excessive security (Doc. #51).  First, Plaintiff has put forth no evidence as to this claim.  Second, Plaintiff was placed in SMU II due to his validation as a security risk and a gang member.  Plaintiff is currently in a pod with other inmates who also were validated as a security risk and gang members, often belonging to rival gangs.  The practice of conducting strip searches and transporting inmates while handcuffed and shackled serves a legitimate penological interest, is not punitive, and does not deprive Plaintiff of the minimal civilized measure of life's necessities.  Lopez, 203 F.3d at 1132-33.  Accordingly, Defendants are entitled to summary judgment as to this claim.

In conclusion, the summary judgment evidence demonstrates that Defendants did not deprive Plaintiff of the minimal civilized measure of life's necessities or that any deprivation was not the product of deliberate indifference by Defendants.  See Wilson, 501 U.S. at 302-03; Lopez, 203 F.3d at 1132-33.  Accordingly, Defendants' Motion for Summary Judgment will be granted as to Plaintiff's claims regarding conditions of confinement.

**B. Deliberate Indifference to Medical Needs**

Defendants argue that Plaintiff received proper treatment for his medical conditions and Plaintiff merely disagrees with the treatment regime (Doc. #59).[4]  Plaintiff maintained that Defendants were deliberately indifferent to his medical needs (Doc. #66).  Plaintiff conceded that he has been provided medical visits, but that such visits are not the same as receiving treatment (Id. ¶ 100).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the

_____

[4] Defendants argue that Plaintiff's claims regarding medical treatment received before September 20, 2003, two years prior to Plaintiff filing his Amended Complaint, are barred by the requisite limitations period as he did not raise these claims in his original Complaint (Doc. #59).  Although Plaintiff does not contest this, the entirety of the treatment will be considered in determining if Plaintiff was subjected to deliberate indifference to his medical needs.

1   'unnecessary and wanton infliction of pain.'" Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

2   "To demonstrate that a prison official was deliberately indifferent to an inmate's serious . . .

3   health needs, the prisoner must show that 'the official [knew] of and disregard[ed] an

4   excessive risk to inmate health.'" Austin v. Terhune, 367 F.3d 1167, 1172 (9th Cir. 2004)

5   (citing Farmer, 511 U.S. at 838).  "Further, the deliberate indifference must be both

6   'purposeful,' and 'substantial' in nature.'" Ruvalcaba v. City of Los Angeles, 167 F.3d 514,

7   525 (9th Cir. 1999) (internal citations omitted).  "Prison officials are deliberately indifferent

8   to a prisoner' serious medical needs when they 'deny, delay, or intentionally interfere with

9   medical treatment. . . .   Mere negligence in diagnosing or treating a medical condition,

10  without more, does not violate a prisoner's Eighth Amendment rights.'" Lopez, 203 F.3d at

11  1132 (citations omitted).  Further, "a mere 'difference of medical opinion . . . [is] insufficient,

12  as a matter of law, to establish deliberate indifference.'" Toguchi v. Chung, 391 F.3d 1051,

13  1058 (9th Cir. 2004) (citations omitted).

14       Plaintiff suffers from Hypertension, Hepatis C, Inguinal Hernia/Incisional Hernia, low

15  back pain, Gastroesophageal Reflux Disease, Barrett's esophagitis, abdominal pain, and

16  weight loss (Doc. #66, Dr. Doris' Aff. ¶ 3).  Plaintiff concedes, however, that the only issue

17  is whether Defendants were deliberately indifferent in regard to his hernia and Barrett's

18  esophagitis (Id. ¶¶ 5-10).  As for his other medical conditions, Plaintiff received treatment

19  which was above the requisite standard of care (Id.).[5]

20  **1. Hernia**

21       Plaintiff submitted multiple Heath Needs Request forms related to back pain,

22  abdominal pain, hernia pain and weight loss, and was seen both by outside consultants and

23  by an ADC physician and nurse on multiple occasions (Doc. #60, ex. F ¶¶7-68).   In

24  particular, Plaintiff was given a neurosurgical consultation for his hernia, at which time no

25  surgical intervention was recommended (Id. ¶ 7N).  Moreover, Plaintiff's treating physician

26

27       [5] Dr. Doris opined that Plaintiff was subjected to deliberate indifference to his medical
    needs, while Dr. Sharp attested to the contrary (Docs. ##60, 66).  However, whether
28  Defendants were deliberately indifferent is a legal determination to be made by this Court.

1    determined that his hernia was reducible, *i.e.*, it can be pushed in with the thumb and put

2    back into place (Id. ¶ 20, n.3).

3         Based on the information, Plaintiff's treating ADC physician determined that surgical

4    intervention was unnecessary (Doc. #60, ex. F ¶ 11; Doc. #66, Dr. Doris' Aff. ¶ 6).

5    Accordingly, Plaintiff's condition was treated with hernia belts and abdominal binders (Doc.

6    #60, ex. G at 88; ex. F ¶ 11; Doc. #66, Dr. Doris' Aff. ¶ 6).  On several occasions, Plaintiff

7    was re-evaluated and his hernia belt and abdominal binder were replaced, and in February

8    2005 he was advised to discontinue doing sit-ups (Doc. #60, ex. F ¶¶ 19, 23, 35, 39, 43-44,

9    60).  In February 2006, a consultation was submitted for general surgery related to repair of

10   the hernias, and the Medical Review Committee found that Plaintiff did not need incisional

11   hernia repair (Id. ¶¶ 60, 62).

12        In September 2006, Plaintiff was seen by an outside general surgeon, Dr. David

13   Pederson, who diagnosed Plaintiff with incisional/ventral hernia which was tender to the

14   touch and painful (Doc. #71, ex. 1 ¶ 14).  The hernia had enlarged since 1998, and would

15   likely continue to enlarge and eventually become complicated (Id.).  However, Dr. Pederson

16   believed that for the moment, Plaintiff's hernia was clearly reducible (Id.).

17        Plaintiff attested that one of the doctors informed him that if Plaintiff was working on

18   a yard crew, his hernia would be repaired, but since he is sedentary, they are unwilling to

19   treat his condition (Doc. #60, ex. G at 88).  Plaintiff, however, admits to being provided a

20   hernia belt to keep the hernia from protruding, and he has been treated for pain with Tylenol

21   (Id. at 89).  Plaintiff's sister attested that she has attempted unsuccessfully to obtain

22   additional medical assistance for Plaintiff through ADC (Doc. #66, ex. 5).

23        Dr. Sharp attested that Plaintiff's hernia has been followed with conservative

24   management, and Plaintiff has never reached the decisional level for his hernias "which

25   include tissue strangulation, non-reducible, incapaciting pain and/or significant interference

26   with normal activities of daily living" (Doc. #60, ex. F ¶ 68).  Dr. Sharp attested that

27   Plaintiff's care and treatment fell within the standard of care within the community and met

28   or exceeded all applicable constitutional standards (Id. ¶ 71; Doc. #71, ex. 1 ¶ 15).

1    Dr. Doris opined that Plaintiff's treatment fell below the standard of care in the
2    community, particularly given the pain symptoms (Doc. #66, Dr. Doris' Aff. ¶ 6). Dr. Doris
3    opined that the common standard of care was surgical repair, particularly since patients with
4    even a reducible hernia often have issues with incarceration and peritonitis (Id.).

5    There is a question of fact as to whether the treatment of Plaintiff's hernia fell below
6    the requisite standard of care and thus resulted in medical malpractice. However, this
7    determination does not foreclose the determination that Defendants were not deliberately
8    indifferent to Plaintiff's medical needs. In Toguchi, the district court considered opinions
9    of different physicians regarding whether the plaintiff's treating physician fell below the
10   standard of care. Touchi, 391 F.3d at 1056-57. Plaintiff's expert opined that the physician's
11   treatment of the plaintiff's conditions was inappropriate and thus fell below the standard of
12   care. Id. at 1059. The district court determined that this accusation was one of negligence
13   as opposed to deliberate indifference to medical needs. Id. The Ninth Circuit affirmed the
14   district court's grant of summary judgment, holding that "[d]eliberate indifference is a high
15   legal standard. A showing of medical malpractice or negligence is insufficient to establish
16   a constitutional deprivation under the Eighth Amendment." Id. at 1061.

17   In the instant action, no reasonable jury could find that Plaintiff was subjected to
18   deliberate indifference to his medical needs. Plaintiff believes that he should have been
19   provided surgery for his hernias. Dr. Doris agrees, opining that surgical repair is the
20   treatment of choice. However, Drs. Sharp and Pedersen opined that Plaintiff's hernias were
21   reducible and thus could be properly treated by abdominal binders and hernia belts. Dr.
22   Pedersen opined that Plaintiff will eventually have to undergo surgery, but does not believe
23   that the need is imminent. Based on the summary judgment evidence, there is merely a
24   difference of medical opinion which is insufficient to establish deliberate indifference, and
25   the evidence does not establish that Defendants acted contrary to what they believed was the
26   standard of care. See Toguchi, 391 F.3d at 1058. Accordingly, Defendants are entitled to
27   summary judgment as to Plaintiff's claim of deliberate indifference to his medical needs as
28   to treatment for his hernias.

1        **2. Barrett's Esophagitis**

2            In December 2005, a consultation request for an Esophagogastroduedenoscopy (EGD)

3    was submitted to the Medical Review Panel, which was conducted in April 2006 (Doc. #60,

4    ex. F ¶¶ 58, 67G).  Plaintiff was found to have Barrett's esophagitis, also known as a peptic

5    ulcer (Id. ¶ 65, 67G; Doc. #66, Dr. Doris' Aff. ¶ 8).  Dr. Doris attested that Plaintiff was

6    being treated with Ibuprofen, a non streriodal anti-inflammatory medication, which is

7    contraindicative because it may lead to ulceration and bleeding (Doc. #66, Dr. Doris' Aff.

8    ¶ 8).  Dr. Doris opined that Plaintiff's condition was potentially life-threatening Id. ¶ 9).

9            Dr. Sharp, however, attested that Plaintiff was being treated with Omeprazole and

10   Magnesium Oxide antacid tablets (Doc. #71, ex. 1 ¶ 12).  Further, although Plaintiff received

11   Tylenol and in 2005 received Ibuprofen, he has not been given Ibuprofen in 2006, after his

12   diagnosis of Barrett's esophagitis (Id. ¶ 13).  Dr. Sharp opined that Plaintiff's condition is

13   not life-threatening and is being properly treated (Id. ¶ 16).

14           As noted by Defendants, Plaintiff only received a diagnosis for Barrett's esophagitis

15   less than a year ago (Doc. #71).  There is a question of fact as to whether Plaintiff received

16   Ibuprofen within the last year, and whether his treatment fell below the requisite standard of

17   care and thus represented medical malpractice.  However, no reasonable jury could find that

18   Plaintiff was subjected to deliberate indifference to his medical needs.  Plaintiff has been

19   seen by both ADC physicians and outside consultants on a regular basis.  Further, he is being

20   treated with Omeprazole and Magnesium Oxide antacid tablets (Id. ex. 1 ¶ 12).  Based on the

21   summary judgment evidence, Plaintiff is receiving sufficient medical treatment for his

22   condition, and there is no evidence in which a jury could find that his treatment for the last

23   year has resulted in deliberate indifference to his medical needs.  Accordingly, Defendants

24   are entitled to summary judgment as to Plaintiff's claim that he was subjected to deliberate

25   indifference to his medical needs.

26           In sum, (1) Plaintiff was provided process due him prior to his validation which was

27   based on "some evidence," (2) Plaintiff was provided the process due him during his

28   re-classifications, (3) Defendants did not violated Plaintiff's Eighth Amendment rights due

to conditions of confinement because Plaintiff was not deprived of the minimal civilized measure of life's necessities, and (4) Defendants were not deliberately indifferent to Plaintiff's medical needs.  Thus, Defendants' Motion for Summary Judgment will be granted and this case will be dismissed in its entirety.

**IT IS THEREFORE ORDERED** that the Motion to Amend/Correct Response to Motion (doc. # 75) is **granted**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. #59) is **granted**.  The Clerk of Court shall enter judgment in favor of Defendants and Plaintiff shall take nothing.  The Clerk shall terminate this action.

DATED this 4th day of December 2006.


_____
Neil V. Wake
United States District Judge